## IN THE U.S DISTRICT COURT FOR
## THE DISTRICT OF MARYLAND
## (GREENBELT DIVISION)

| | |
|---|---|
| **April T. Ademiluyi**<br>324 Main Street#171<br>Laurel, MD 20707<br><br>              Plaintiff<br>v.<br><br>**Carla N. Andrews**<br>3403 21st Street, S.E.<br>Washington, DC 20020<br><br>**Honorable Michael R Pearson**,<br>In his personal capacity<br>200 St Paul Street<br>Baltimore, MD 21202<br><br>**Honorable Sheila Tillerson Adams**,<br>In his personal capacity<br>200 St Paul Street<br>Baltimore, MD 21202<br><br>**Honorable Daneeka Varner Cotton**,<br>In his personal capacity<br>200 St Paul Street<br>Baltimore, MD 21202<br><br><br>              Defendants. | 8:24 cv 03616 |

## <u>FIRST AMENDED COMPLAINT</u>

Plaintiff, April T Ademiluyi brings an action at law against Defendant, Carla N. Andrews for tortious interference with contractual relations and intentional infliction of emotional distress. Plaintiff also brings an action at law against Defendants, Judges Sheila T. Adams, Daneeka V. Cotton, and Michael R. Pearson pursuant to 42 U.S.C. § 1983 and the First Amendment of the United States Constitution.    In support of her causes of action, Plaintiff Ademiluyi states as follows:

1

**INTRODUCTION**

1.      There is a related case pending, Ademiluyi v. Albright, et. al 8:23cv03526 that alleges retaliation on a different basis than this case.

2.      The voters elected, Plaintiff April Ademiluyi to the bench of the Circuit Court for Prince George's County in 2020.  Plaintiff Ademiluyi's victorious campaign included a video and blog statement about the corruption she experienced when she reported being drugged and raped by attorneys at a National Bar Association conference in Tampa, Florida in 2012.  Ademiluyi's campaign video emphasized that she would not engage in the corruption she suspects was happening in the Circuit court for Prince George's County.

3.      Because of Plaintiff's campaign about the judges, she was met with hostility by Adams and Cotton when she came to the bench.

4.      Defendants, Adams and Cotton, and the attorneys involved in corruptly influencing prosecutors to cover up drugging and raping Ademiluyi together sought to retaliate against Ademiluyi for publicly speaking about reporting that drug rape and the corrupt coverup of the rape and suspected corruption within the Prince George's County Circuit Court.

5.      Shortly after taking the bench, Honorable Daneeka Varner Cotton ("hereinafter referred to as "Judge Cotton or Cotton") attempted to force Plaintiff Ademiluyi to close *Hawkins v. Lowe,* where Ademiluyi had concerns for the welfare of the children. Ademiluyi did not close the case.

6.      Plaintiff Ademiluyi also began receiving harassing letters from an imprisoned, convicted rapist serving a life sentence for drugging and raping women in Miami, Florida.

7.      Plaintiff Judge Ademiluyi next discovered someone had forged her electronic signature on an order that Plaintiff, Judge Ademiluyi, did not sign and entered it on the record in *Hawkins v. Lowe* without her knowledge.   When Plaintiff, Ademiluyi attempted to investigate the

forgery, she met repeated resistance from the Chief and Administrative Judge at the time, the Hon. Sheila T. Adams (hereinafter referred to as Judge Adams or Adams). Judge Adams thwarted Ademiluyi's investigation by, among other things, instructing the courthouse and the Prince George's County Information Technology "hereinafter IT" department not to assist Ademiluyi in her investigation regarding who may have accessed her computer, signed the counterfeit order, and entered it in the record. From her own investigation and her interactions with other judges, Ademiluyi learned that Judge Cotton had entered an order in the same case to close the matter without consulting with Ademiluyi, who was the presiding judge. The counterfeit order had the effect of reopening the case. Ademiluyi suspected the forger was either the Adams or Adams' friend on the bench, the Hon. Daneeka V. Cotton.

8.     Ademiluyi decided to file a formal complaint against Defendants Adams and Cotton with the Office of the Maryland State Prosecutor and the Maryland Commission on Judicial Disabilities, believing an investigation of the electronic evidence available at the courthouse would reveal the forger's identity. It did. Adams suddenly resigned from her long-held position and retired from the bench. Although Ademiluyi has not been permitted to inquire regarding the reason for Judge Adams' sudden departure from the bench, the timing of her departure suggests Ademiluyi's suspicions were confirmed. The departure of Judge Adams marked the beginning of a coordinated campaign to retaliate against Ademiluyi for filing her complaints.

9.     Judge Cotton admitted she wanted consequences for Plaintiff Ademiluyi, writing to Investigative Counsel, "there should be some repercussions [for Ademiluyi's filing of her complaints]." Exhibit E.

10.    The Honorable Michael R. Pearson (hereinafter referred to as Judge Pearson or Pearson) stepped into the fray, rallying behind his longtime mentor Judge Adams and his

clandestine romantic partner Judge Cotton—who happens to be married—after Judge Ademiluyi rejected his sexual advances.

11.     Ademiluyi complained to the FBI about the harassing letters from the prisoner. Unknowing the romance between Pearson and Cotton and Pearson's involvement in the retaliation, Ademiluyi informed Pearson of her complaint to the FBI and asked for his help. This caused Adams, Cotton, and Pearson to escalate the retaliation against Ademiluyi.

## PARTIES

12.     Plaintiff, April Ademiluyi, is an adult female and resident of Maryland, who address is 324 Main Street #171 Laurel, MD 20707. She was elected to the bench of the Circuit Court for Prince George's County in November of 2020.

13.     Defendant, Carla N. Andrews, is a freelance court reporter, who resides in the District of Columbia.

14.     Defendant, Judge Michael R. Pearson, is an elected Judge of the Circuit Court for Prince George's County. Regarding Plaintiff's federal constitutional claims alleged herein, Defendant Judge Pearson is sued only in his individual capacity.

15.     Defendant Judge Sheila T. Adams is a formerly elected Judge of the Circuit court for Prince George's County. Regarding Plaintiff's federal constitutional claims alleged herein, Defendant Judge Adams is sued only in her individual capacity.  Judge Adams was the administrative judge at the time Judge Ademiluyi was elected to the bench until December 31, 2022.

16.     Defendant Judge Daneeka V. Cotton is an elected Judge of the Circuit Court for Prince George's County. Regarding Plaintiff's federal constitutional claims alleged herein, Defendant Judge Cotton is sued only in her individual capacity.  Judge Cotton has been the administrative judge since January 1, 2023.

## JURISDICTION AND VENUE

17.     Venue is proper in the District of Maryland pursuant to 28 U.S.C. § 1391(b) because the events or omissions giving rise to the conduct complained of occurred in this district. Venue is also proper because Maryland has personal jurisdiction over the Defendant, due to the Defendant's actions that caused tortious injury within Maryland.

18.     This Court has subject matter jurisdiction over Plaintiff's federal constitutional claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. §§ 1983.

19.     This Court has diversity jurisdiction over the claims against Carla N. Andrews under 28 USC § 1332(a)(1) because the amount in controversy exceeds $75,000 and Carla Andrews is a resident of the District of Columbia and Plaintiff is a resident of Maryland.

## FACTS

### The alliance with Parks, Crump, and Judge Stenise Rolle

20.     In 2012, Ademiluyi and another woman was drugged in the hotel room of Daryl Parks ("Parks") taken out of the room and both raped. A male was also drugged around the same time in the hotel room of Parks.

21.     Parks and his law partner, Ben Crump("Crump") both, at that time, were representing the family of Trayvon Martin and receiving significant media attention.

22.     Ademiluyi reported the rape to the Tampa, FL Police Department, who secretly recorded a phone conversation between Phillips and Ademiluyi. In the call, Phillips admits the best sex for him is with someone too incapacitated to be aware of the sexual contact.

23.     The recording was destroyed. A new recording was created where the confession was removed. It was obvious to Ademiluyi that the recording was recreated from start to finish

because in the fake recording, Phillips asked Ademiluyi to hold on, and she did so for two full minutes. In the real conversation, Phillips never asked her to hold on. This was just a time filler so the time of the fake recording would match the time of real recording and phone records.

24.    Parks and Crump had a strong relationship with the then Attorney General of Florida, who was a prosecutor in the office that had jurisdiction over her rape case for 18 years.

25.    Phone records show, at the time the recorded confession was destroyed, Parks was communicating with Bondi, and he gave her a campaign donation.

26.    Ademiluyi sued the perpetrators but had to dismiss the case because her attorney without explanation suddenly died, and she could not find another attorney because most feared retaliation for assisting her.

27.    In 2016, Ademiluyi ran for judge of the Circuit Court for Prince George's County, where she campaigned on the news reports that suggested the judges were profiting from mass incarceration of children. Judge Ademiluyi lost the race.

28.    After the race, Adams began planning with attorney Stenise Rolle, who worked for Parks and Crump and recently relocated from Florida, to formulate a plan to oppose Ademiluyi should she run again.  Adams first worked to get the judges to appoint Stenise Rolle, who worked for Parks and Crump, as a foreclosure magistrate for Circuit Court for Prince George's.

29.    Cotton testified in her deposition that she has a relationship with Crump.

30.    In April 2020, Ademiluyi again ran a campaign for Judge of the Circuit Court where she told her story of being drugged and raped and the corruption of Bondi, Parks, and Crump to cover it up in a campaign video and blog statement on her website.

## Reporting the forgery and computer crimes.

31.    Shortly after taking the bench, Plaintiff Ademiluyi was assigned the child custody case of *Hawkins v. Lowe* CAD16-07166 where Plaintiff Judge Ademiluyi experienced public

corruption first-hand. Defendant Cotton asked, in violation of Md judicial ethics rules and the Md Constitution, for Ademiluyi to close the case, and Judge Ademiluyi refused. Judge Ademiluyi was concerned about the welfare of children because the father alleged, they were living with a man facing child abuse charges. Plaintiff refused to close the case so that a social worker could investigate the living arrangements of the children. Judge Cotton, however, was not concerned about the welfare of the children and insisted Judge Ademiluyi close the case.

32.     Judge Ademiluyi's electronic signature, without her permission, appeared on an Order while the file was not in her chambers. Properly concerned with how this could have happened, Judge Ademiluyi investigated the circumstances of how her electronic signature could have appeared on an Order that she did not sign.

33.     Judge Ademiluyi's attempt to investigate was resisted by Judge Adams. Judge Adams made disparaging, disrespectful remarks, and outright refused to allow the IT Department to assist Judge Ademiluyi to investigate.

34.     Among other actions, Judge Ademiluyi contacted the Courthouse IT Department to find out who was accessing her password protected files where she kept her orders. She could not obtain all the information she sought because Judge Adams intervened.

35.     Judge Ademiluyi next sought assistance from Prince George's County IT for the audit logs to figure out whose computer was logging into her Microsoft Account without her permission. But Prince George's County IT produced logs that omitted most of that information. IT produced logs that provided a small number of entries of an identifier of a virtual desktop logging to Judge Ademiluyi's account that did not match the identifier of her virtual desktop. Judge Ademiluyi sent an email requesting the virtual monitor assignments for every computer user in the courthouse. And IT began changing the identifier of her virtual monitor. Thus, making it

impossible for Judge Ademiluyi to figure out who was accessing her Microsoft Account. Judge Adams used IT to deceive Judge Ademiluyi.

36.    Judge Ademiluyi next insisted Prince George's County IT connect her with Microsoft so she can inquire why the audit logs omitted the desktop computers identifiers but contained a few entries of a virtual desktop. Judge Adams subsequently directed IT not to assist Judge Ademiluyi any further. The few entries of a virtual desktop identifier in the audit logs provided to Judge Ademiluyi were mistakenly produced. To deceive Judge Ademiluyi, IT intended to omit any identifier of a computer logging into Judge Ademiluyi's computer in the audit logs.

37.    Judge Ademiluyi knew there was an electronic evidence trail that would show the order was signed without her permission while the file was not in her chambers and likely identify the culprit who filed the counterfeit order. Therefore, Judge Ademiluyi took several steps to cause a more formal investigation. She complained to the Office of State Prosecutors, which after a thorough review referred her to the Commission on Judicial Disabilities ("Commission'). Similarly, the Office of Fair Practice referred her to the Commission. And finally, the Chief Judge of the Court of Appeals and head of the administration wrote to her that he has no authority to investigate judges and her only option for an investigation was the Commission.

38.    Judge Ademiluyi thus provided information to the Commission about her suspicions that Judge Adams and/or another judge (upon information and belief--Judge Cotton) forged Plaintiff Judge Ademiluyi's signature on an order and were monitoring her emails to sabotage her work product. Investigative Counsel requested that Judge Ademiluyi draft a complaint under oath against both judges, which she did.

39.    When Plaintiff, Judge Ademiluyi submitted complaints to the Office of State Prosecutors and to the Commission she became a whistleblower, engaging in conduct protected by the First Amendment of the United States Constitution.

8

## Reporting the use of a convicted rapist to harass her.

40.     On or about October 15, 2021, around the same time, plaintiff Ademiluyi discovered her signature appeared on an order without her permission, she began receiving harassing letters from a convicted rapist. This inmate was a former police officer in Miami, Florida, who drugged and raped women, claiming they had consented to being drugged. The Department of Justice prosecuted him for these crimes. He was convicted and sentenced to life in prison in 2012, and he is currently serving his sentence in a federal maximum-security prison in Arizona

41.     In his letters, the prisoner claimed to know a lot of personal information about plaintiff Ademiluyi, including the fact that she had recently won an election to the Circuit Court for Prince George's County. Since federal prisoners do not have access to the internet or the world wide web, it was clear that someone was providing this inmate with information about him, and using him to communicate with her.

42.     Plaintiff Ademiluyi reached out to the head of the security for the judiciary, who contacted her local sheriff to inform him of the situation. The Sheriff then contacted Adams, who then scolded Ademiluyi for not contacting her first. Adams told Ademiluyi that she is not supposed to discuss anything with law enforcement without getting her permission to do so.

43.     The Sheriff informed Ademiluyi that he reached out to the prison, and they assured him that the inmate would not contact Plaintiff Ademiluyi again. However, plaintiff Ademiluyi felt deceived by Adams and the sheriff, much like when she was trying to figure out who was accessing her computer, but this occurred before she confronted Adams about forging her signature.

44.     Ademiluyi disregarded Adams and the sheriff and reported it to the FBI and Office of State Prosecutor that one of the judges was using the imprisoned, convicted rapist to send her harassing letters.  The Office of State Prosecutor told her only the FBI has jurisdiction.

9

45.     When Plaintiff, Judge Ademiluyi reported the harassment to the FBI, Office of State Prosecutor, she became a whistleblower engaging in conduct protected by the First Amendment of the United States Constitution and 18 U.S.C§ 1513 Retaliating against a witness, victim, or an Informant and its state equivalent Md Criminal Code §9-303.

46.     Upon information and belief, Judge Adams resigned because of Judge Ademiluyi's Complaint to the Commission.  The timing of Judge Adams' resignation suggests she negotiated her resignation in exchange for the Commission's agreement not to pursue administrative proceedings for sanctionable conduct against her.

47.     The Commission has a pattern and practice of issuing a letter to the complainant that they did not find the judge committed any sanctionable conduct in lieu of pursuing charges against the judge, but the rule requires that they inform the complainant that the Judge's retirement was the reason for them not investigating or pursuing charges.

48.     Although relevant, the Commission refuses to release the contents of the file that will show what led to Judge Adams' abrupt resignation shortly after Judge Ademiluyi filed her complaint.

### Judge Adams Causes Investigative Counsel to Open Case Number  CJD2022-079 Against Judge Ademiluyi In Retaliation for Ademiluyi's Complaint Against Adams.

49.     Judge Adams' initial hostility towards Judge Ademiluyi created a prior complaint against Judge Ademiluyi to the Commission. Judge Adams caused the Commission to open investigation CJD2021-042 of Judge Ademiluyi around August 2021, and the Commission dismissed it in January 2022. The complaint alleged Judge Ademiluyi failed to report to work. Judge Ademiluyi, however, simply requested to observe a judge in a jury trial who was not hostile towards her. The Judge she was assigned to observe, Judge Sharon Kelsey, openly expressed her

anger towards Judge Ademiluyi, and the day she was assigned to sit with Judge Kelsey, Judge Ademiluyi suspected that she just caused damage to her vehicle in the parking lot.

50.     As a result of Plaintiff Ademiluyi's Complaint to the Commission, Judge Adams grew increasingly hostile towards Judge Ademiluyi and retaliated.  Just before she abruptly resigned to avoid charges, Judge Adams submitted well over 500 pages to Investigative Counsel, and those documents formed the basis of the CJD-2022-079 ethics case against Judge Ademiluyi. Exhibit F.  Most of the conduct at issue in CJD 2022-079 arose *after* Judge Ademiluyi filed her complaint against Judge Adams.  At the request of Judge Adams, shortly before she resigned, witnesses were forced to provide information she could use against Ademiluyi.

51.     Judge Adams in her second complaint, causing the investigation CJD2022-079, included items that she had not considered worthy of initially complaining about in CJD2021-042. For e.g., Judge Ademiluyi's campaign statement that was made in 2022 where she vows to stand up to judicial corruption was now a problem three years later when Judge Ademiluyi is complaining about Judge Adams and Cotton's corruption.

52.     In June of 2022, Judge Ademiluyi was in the process of completing her criminal jury trial training. The 7th Circuit new judge training is a tool that Judge Adams and Cotton use to groom judges for participation in their corrupt regime. A senior judge sits next to the judge in training solely to decide the case for them and to give the public the false perception that the judge in training is deciding the case in violation of Maryland judicial ethics rules and the Maryland Constitution. There is no other Circuit in Maryland that trains this way.

53.     On or about June 7, 2022, Judge Adams assigned Judge Ademiluyi to sit with Judge Cathy Serrette for her criminal jury trial training in *State v Carlos Lambright*, CT210423X.  Judge Cathy Serrette told Judge Ademiluyi she could not rule against the defense attorney, who is also an elected Maryland Delegate, CT Wilson without Judge Adams' permission.  Judge Adams's

husband, Timothy Adams, was running for Maryland Comptroller, and they needed Delegate CT Wilson's support for their campaign. That need for CT Wilson's support is further evidenced in a campaign donation in February 2022 from Judge Adams's husband to Delegate CT Wilson.   Judge Ademiluyi was disgusted and furious with Judges Serrette and Adams. Judge Ademiluyi and Judge Adams had a heated exchange about Judge Adams' corrupt motives in *Lambright* and Judge Adams and Cotton forging her signature in other cases.  Judge Ademiluyi also got into a heated exchange with Judge Serrette regarding how Judge Serrette demanded her to rule.

54.     On or about June 30, 2022, the Commission began investigating Judge Ademiluyi, the whistleblower, in CJD 2022-079 while Judge Ademiluyi's complaint against Judge Adams was pending. Exhibit F Judge Adams requested the investigation of Judge Ademiluyi in response to Judge Ademiluyi's complaint against her.

55.     The malice towards Judge Ademiluyi is palpable in the Statement of Charges prepared by Investigative Counsel in CJD 2022-079 based upon information provided by Judges Adams and Cotton. The Statement of Charges alleged among other things that Judge Ademiluyi failed to disclose she was a rape "victim" in *State v Lambright,* a domestic violence case. It alleged that she is biased against those accused of violence against women, which is untrue and unsupported by any evidence.

56.     Even though the resignation and actions of Judge Adams and the actions of Judge Cotton are relevant, the Commission refused to disclose the Reports and Recommendations made for the Complaint Judge Ademiluyi filed against them. Investigative counsel produced a heavily redacted and incomplete file of Judge Ademiluyi's complaints against Judges Adams and Cotton. And Judges Adams and Cotton will not waive confidentiality of their files.

**Judges Adams, Cotton and Pearson Cause Investigative Counsel
to Open Case Number  CJD 2023-005 Against Judge Ademiluyi
In Retaliation for Ademiluyi's Complaint to the FBI**

57.    When Ademiluyi first took the bench in Prince George's County, Judge Pearson, who was divorced, began to show a personal interest in Ademiluyi.

58.    After Ademiluyi rejected Pearson's advances and after Investigative Counsel interviewed Judge Pearson in connection with the CJD 2022-079 case against Ademiluyi, Judge Pearson joined with Judge Cotton to cause a second case to be opened against Ademiluyi, that is CJD 2023-005.

59.    As the retaliation against Judge Ademiluyi was ramping up, she reached out via text to Judge Pearson to get his help with the retaliation unknowing that he like many others was a part of Judges Adams and Cotton's CJD 2022-079 retaliation case. Exhibit C, D, F. But Judge Pearson had already made a statement to Investigative Counsel that Judge Ademiluyi was difficult to work with. Judge Ademiluyi also did not know Judges Pearson and Cotton were having a secret romantic affair. Judge Pearson declined her invitation which caused Judge Ademiluyi to grow suspicious and confront him with whether he was a part of the retaliation.

60.    Judge Cotton became the Administrative Judge for the Circuit Court for Prince George's County on January 1, 2023. Judge Adams' resignation was effective December 31, 2022. Within one month of Judge Cotton starting her administrative judge term, Investigative Counsel started investigating the whistleblower, Judge Ademiluyi in case number CJD 2023-005.

61.    Judge Cotton testified in her deposition that Adams told her to file a complaint alleging that Judge Ademiluyi was sending Judge Pearson unwanted messages.

62.    In an email on January 3, 2023, Ademiluyi explained to Pearson that she heard from members of the community that Adams was going to destroy her. Pearson forwards the email to Cotton, and Cotton provides this email to Investigative Counsel.

63.    On January 21, 2023, in an email ( herein after referred to as the "FBI email"), Plaintiff Ademiluyi explained to Pearson that she was drugged and raped at a bar conference in

Tampa, Florida, and the newly sworn Judge Stenise Rolle (hereinafter referred to as "Rolle") use to work for the men involved in tampering with evidence to cover up the drug rape. Ademiluyi explained that someone was using a man convicted of drugging and raping women in Miami, Florida, who was serving a life sentence to send her harassing letters. Ademiluyi told Pearson that she reported it to the federal authorities who were supposed to let her know who was using this prisoner to harass her, and she had not heard anything. Ademiluyi explained the emotional trauma she experienced from the drug rape and how rape affects survivors. Ademiluyi informed Pearson that she was scared.

64.     Defendants Cotton and Adams have relationships with Parks and Crump. Rolle had also been elevated to Circuit Court Judge. Parks spoke on Rolle's behalf at her investiture in January 2023.

65.     Phone records show frequent communications between Defendants Pearson, Cotton, and Adams after the January 3rd email that suddenly ceased around the middle of February 2023. It suggests that they were discussing the FBI email.

66.     On April 28, 2023, Ademiluyi confronted Defendant Pearson in person about ruling on her case, without authority, a week ago. Later that day, Ademiluyi sends Pearson an email confronting him with the notice (and attaching the notice to the email) that Investigative Counsel was investigating her harassing, threatening, and intimidating him and accusing Pearson and others of causing her distress with the emails Ademiluyi sent to Pearson on or about March 28, 2023. Defendant Pearson responded that he was only cordial to her because witnesses were around. Defendant Pearson forwards these emails to Investigative Counsel.

67.     In bad faith, the Investigative Counsel immediately sent a letter to Ademiluyi stating that the notice of investigation was confidential and that Ademiluyi was not permitted to

disclose the letter. This was to get Pearson's alliance and reinforce a promise to Pearson that their retaliatory scheme and false allegations would never become public.

68.    Investigative Counsel disclosed to Ademiluyi that she had possession of all communications between Defendant Pearson and Plaintiff Ademiluyi that occurred before and after the January 21, 2023 FBI email but did not have January 21, 2023 FBI email. In Investigative Counsel's summary of Judge Pearson's oral statement to her, she also states that Defendant Pearson discussed with her Plaintiff Ademiluyi 's emails on December 18, 2022, January 3, 2023, January 18, 2023, and April 28, 2023. This suggests that Defendant Pearson withheld the January 21, 2023 FBI email, or Investigative Counsel concealed her knowledge of it.

69.    Judge Pearson's own statements to Investigative Counsel show how right Judge Ademiluyi was about the retaliation scheme. For example, he shockingly alleges he fears Judge Ademiluyi will file a rape complaint against him and that she is trying to get him alone to falsely accuse him of rape when he is the one who first pursued a personal relationship with Judge Ademiluyi. Exhibit A

70.    Judge Pearson also told investigative counsel that Judge Ademiluyi is trying to take down the "corrupt" sitting judges and that she is eager to file complaints against men, even questioning her mental state. Exhibit A. Pearson publicly testified consistent with his statement to investigative counsel that reads in pertinent part:

> SUMMARY OF ORAL STATEMENT BY JUDGE MICHAEL PEARSON PURSUANT TO MARYLAND RULES 18-422(b)(2)(B)(i) and 18-433(b)(2)(B).
> Investigative Counsel Tanya Bernstein met in person with the Honorable Michael Pearson on January 10, 2023, and spoke with him by telephone on January 20 and April 28, 2023....
> On January 10, 2023, Judge Pearson described some issues that he was having with Judge April Ademiluyi. Administrative Judge Daneeka Cotton was also present. Judge Pearson explained that he was part of the training committee when Judge Ademiluyi joined the bench in December 2020. He estimated that he was the least involved with her training and that ... Judge Pearson stated that Judge Ademiluyi came to the bench with a reputation for being litigious and sensitive in her communications with men in particular. He further stated that it was common knowledge that Judge Ademiluyi had filed lawsuits alleging

sexual assault at the National Bar Association in Florida. He also recalled that during Judge Ademiluyi's campaign she promised to clean house and accused the sitting judges of corruption. He was cautious and did not meet with or talk to Judge Ademiluyi without others present. His staff and others knew about this practice.

...Judge Ademiluyi texted Judge Pearson again on December 20, 2022, and asked him if he wanted to hang out....After consulting with Judge Cotton, Judge Pearson responded to Judge Ademiluyi's text by again directing her not contact him on his cell phone...Judge Pearson expressed concern about Judge Ademiluyi's mental state. Her did not know what "tension" or "beef" that Judge Ademiluyi continually referred to. Judge Pearson further expressed concern that Judge Ademiluyi would try to make claims against him similar to those she made in her previous lawsuits.

Judge Pearson talked with Senior Judge Sheila Tillerson Adams about the January 3, 2023, email. He thought that Judge Ademiluyi was referring to Judge Cotton or Judge Adams in that email. ....

Judge Pearson subsequently advised that Judge Ademiluyi had made multiple

attempts by phone and email on January 18, 2023....

71.    Similarly, Judge Cotton alleged she has concern for holding a bench meeting because she witnessed whenever Judge Ademiluyi and Judge Pearson interact, Judge Ademiluyi has a triggered emotional response to Judge Pearson.  Exhibit B. Cotton publicly testified consistent with her statement to investigative counsel that reads in pertinent part:

SUMMARY OF ORAL STATEMENT BY JUDGE DANEEKA VARNER COTTON PURSUANT TO MARYLAND RULES 18-422(b)(2)(B)(i) and 18-433(b)(2)(B).

Investigative Counsel Tanya Bernstein met in person with the Honorable Daneeka Varner Cotton on January 10, 2023, and spoke with her by telephone on January 18, 2023. Judge Michael Pearson was also present for the meeting on January 10, 2023....

During the meeting on January 10, 2023, Judge Cotton stated she was aware of the issues that Judge Pearson was having with Judge April Ademiluyi. She expressed multiple concerns about Judge Ademiluyi....Judge Cotton also expressed concern about holding a bench meeting in person because it seemed that whenever Judge Ademiluyi saw Judge Pearson it triggered a response from her. Judge Cotton referenced her own experiences with Judge Ademiluyi and questioned whether she was fit for judicial office.

72.    Despite their "concern," neither Judge Cotton nor Judge Pearson attempted to discuss their concern with Ademiluyi.

73.    The letters from the prisoner caused Ademiluyi severe emotional distress. Pearson and Cotton's statement also caused her severe emotional distress because she feared they were working with Parks and Crump and this prisoner to harm her.

74.     Judges Cotton and Pearson acted in further retaliation for Judge Ademiluyi's complaint that forced Adams's resignation and the complaint against Cotton and quickly ran to the Commission to do just that.

75.     Adams escalated the retaliation after Ademiluyi sent the FBI email to Pearson. Adams and her allies (members of the commission and other judges) thought they could pressure Ademiluyi to accept discipline with the threat of public charges for CJD2022-079 and CJD2023-005. Mark Chandlee ("Chandlee"), Administrative Judge of Calvert County, reports to Adams and is a strong ally and supporter of Adams and Cotton. Chandlee was also the Chairman of the Commission Inquiry Board—the first step in the process of charging Ademiluyi. Chandlee and Investigative Counsel offered to disregard CJD2023-005 if Ademiluyi would accept discipline. Adams assigned Ademiluyi and Chandlee to sit on a three-judge sentencing panel on a rape case just before she resigned.

76.     In retaliation for Ademiluyi's complaint to the FBI, the charges of CJD2022-079 became public.

77.     When Ademiluyi declined to accept discipline, Adams pulled Attorney General Anthony Brown, a longtime Prince George's County politician, who owed her a political favor, into the hearing process to control the witnesses and protect the judges from incriminating themselves. In 2018, Adams' husband gave a campaign donation to Brown's congressional campaign. The Attorney General acted as the personal criminal defense firm for the retaliation conspiracy.

78.     On November 15, 2023, the Commission charged Judge Ademiluyi with harassing, threatening, and intimidating Judge Pearson through her communications with him because he alleges Judge Ademiluyi is trying to get him alone to falsely accuse him of rape. The Commission published the charges and Judge Ademiluyi's response to the charges on their website with more

than half of Judge Ademiluyi's response redacted, without her consent. The Commission is misleading the public as to Judge Ademiluyi's response to the charges.

79.     At the public hearing for CJD2023-005, all the witnesses that testified against Ademiluyi were influenced by Defendants Cotton or Pearson.

**Judge Ademiluyi's Swift Removal From the Bench**

80.     Ademiluyi commenced this action on December 29, 2023.

81.     About three days after initiating 8:23cv03526, the Supreme Court of Maryland (not acting as a Court but as an agency policing itself) placed Judge Ademiluyi on administrative leave with pay upon their receipt of a letter from the Commission enclosing a copy of the lawsuit, opining that administrative leave was necessary "to maintain public confidence in the judiciary" and "ensuring the continuing orderly administration of justice" in light of the federal lawsuit.

82.     On January 25, 2024, the Commission amended its charges against Judge Ademiluyi, alleging Ademiluyi committed sanctionable misconduct by filing this lawsuit.

83.     To prevent litigating the issues in this 8:23cv03526, that same day the Commission entered an order prohibiting Judge Ademiluyi from questioning Judges Cotton and Pearson at their depositions on the following topics:

> Judge Ademiluyi's allegations about being sexually assaulted in 2012; anything concerning the individuals who allegedly committed the sexual assault in 2012; Judge Ademiluyi's allegations about various judges forging her signature on court orders; Judge Ademiluyi's allegations about various judges improperly monitoring her emails; Judge Ademiluyi's allegations about being a "whistleblower" for wrongdoing within the Circuit Court for Prince George's County; the basis for Judge Sheila R. Tillerson Adams' choice to retire; allegations concerning First Amendment retaliation; the subject matter, causes of action, and/or alleged injuries and damages raised in Judge Ademiluyi's federal lawsuit against Judge Sheila R. Tillerson Adams (Ret.), Judge DaNeeka V. Cotton, and Judge Michael R. Pearson in the United States District Court for the District of Maryland, Case No. 8:23-cv03526-LKG; and any alleged sanctionable conduct that was charged against Judge Ademiluyi within the four-corners of the Statement of Charges in CJD 2022-079.

84.    At the same time Judge Ademiluyi filed this lawsuit to adjudicate her First Amendment rights, she sought three months medical leave to accommodate the stress caused by the retaliation.

85.    From September to December 2023, the Commission subjected her to hostile, high volume, fast paced litigation that she could not adequately participate in or defend and simultaneously perform her judicial duties. Up until she requested leave, Judge Ademiluyi prioritized her judicial duties and did so as the rules require.

86.    In further retaliation, the Commission used Ademiluyi's request for sick leave to justify initiating another action against Ademiluyi seeking a mental health examination. Investigative Counsel initiated a third matter, CJD2024-007, into Judge Ademiluyi's mental fitness solely based on her statements that she was suffering from stress from the retaliation and needs time off to recuperate.

87.    On March 22, 2024, Judge Ademiluyi provided Investigative Counsel with documentation that she has received adequate treatment and is ready and fit to return to her duties.

88.    But Investigative Counsel seeks Ademiluyi's medical records and to compel Ademiluyi to undergo a mental health examination with a doctor of her choosing.

89.    The Commission concluded two days of the 2023-005 hearing on April 29 and May 2, 2024, with one day remaining on May 10, 2024. At the hearing, Judge Ademiluyi was prohibited from presenting evidence and questioning witnesses on any of the topics in the protective order.

90.    On May 6, 2024, the Supreme Court of Maryland (not acting as a Court but an agency policing itself) accepted the Commission's findings of facts in the CJD 2022-079 case. Ignoring the Commission's recommended sanctions, the Maryland Supreme Court (not acting as a Court but an agency policing itself) summarily removed Judge Ademiluyi as a Judge on the Circuit Court for Prince George's County.

91.     Adams had allies at every step of the process in charging Ademiluyi with misconduct and removing her from the office that she was communicating with and that was motivated to retaliate and assisted her in retaliating. Mark Chandlee, Chairman of the Inquiry Board, Michael Reed Chairman of the Commission until the 2022-079 public charges, and Michelle Hotten, member of the Supreme Court (not acting as a court but as an agency) are all strong allies that have regular communications with Adams.

92.     On May 7, 2024, the Commission stayed CJD 2023-005.

## CLAIM AGAINST THE JUDGES IN THEIR INDIVIDUAL CAPACITY

### COUNT I
### FIRST AMENDMENT RETALIATION FOR BEING A FEDERAL WITNESS
### (Defendants: Judges Adams, Cotton, and Pearson)
### 42U.S.C. § 1983

93.     Plaintiff, Ademiluyi, incorporates the allegations in the preceding paragraphs.

94.     In October 2021, Ademiluyi filed a complaint with the FBI alleging harassment in that a judge was believed to be responsible for using a convicted rapist to send her letters to torment her about her experience of being drugged and raped.

95.     A judge conspiring with an imprisoned convicted rapist to harass Ademiluyi because she is a survivor of rape is clearly a matter of significant public concern.

96.     The First Amendment of the U.S. Constitution prohibits retaliation against public officials like Ademiluyi for exercising their right to seek redress of grievances by the filing of complaints with government agencies.  In other words, Ademiluyi's complaints about the judges using a federal prisoner to harass her constituted protected communications.

97.     As set forth herein, the Defendants Adams, Pearson and Cotton retaliated against Ademiluyi for making her complaints by mischaracterizing Ademiluyi's performance and

character for the purpose of causing charges to be initiated and pursuing the CJD 2022-079 and 2023-005 cases alleging sanctionable misconduct against Ademiluyi for, among other things, trying to get Pearson alone to false accuse him of rape on the basis of a text message between Ademiluyi and Pearson where she is asking for his help and expressing her fear of Adams and Cotton's plans to retaliate and use of an imprisoned convicted rapist to threaten her about her experience of reporting being drugged and raped.

98.    The actions of Judges Adams, Pearson and Cotton were taken under color of state law and are not administrative or judicial in nature and therefore the Defendants are not entitled to absolute judicial immunity.

99.    At the time of the actions of the Defendants, it was clearly established law that the First Amendment and 18 U.S.C.§ 1513 prohibits retaliation for reporting federal crimes.  18 U.S.C§ 1513 states in pertinent part,

> (e) Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including *interference with the lawful employment or livelihood of any person,* for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense, shall be fined under this title or imprisoned not more than 10 years, or both.

Therefore, the Defendants are not entitled to qualified immunity.

WHEREFORE, Plaintiff demands judgement against the Defendants, jointly and severally, for compensatory and punitive damages, for reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1983, interest and such other relief as the Court deems just and proper.

## CLAIMS AGAINST THE COURT REPORTER

## COUNT II TORTIOUS INTERFERENCE WITH A CONTRACT

### Systemic Corruption in the Prince George's County Circuit Court

100.     Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

101.     In January of 2024, Judge Ademiluyi hired Planet Depos to provide a court reporter and conference room for the depositions of Cotton and Pearson for the CJD 2023-005 case on February 13, 2024 and February 26, 2024.   Judge Ademiluyi's counsel engaged Planet Depos on her behalf.

102.     As part of the contractual relationship, Judge Ademiluyi gave Planet Depos the discretion to select the court reporter for Judge Pearson and Cotton's deposition. Planet Depos selected their independent contractor, Carla Andrews.

103.     On the day of Judge Pearson's deposition, Judge Ademiluyi had no reason to believe that anyone would interfere with her relationship with the court reporter.

104.     Carla Andrews ("Reporter Andrews") has been a court reporter for 30 years and an independent contractor for Planet Depos for 10 years.  Judges Cotton and Adams, both long time judges, run the Prince George's County Circuit Court that regularly employs court reporters.

105.     On February 13, 2024, Judge Ademiluyi deposed Pearson. The parties present who identified themselves on the record at the deposition were Judge Ademiluyi and her counsel, Assistant Attorney General James Spiker representing Judges Cotton, Adams, and Pearson and Investigative Counsel Tanya Bernstein, Assistant Investigative Counsel Derek Bayne, and Assistant Investigative Counsel Tamara Dowd.

106.     At his deposition, Judge Pearson denied making the oral statements that Investigative Counsel alleged he made to her in her written summary of his statement attached as Exhibit A to the Complaint.  Judge Pearson denied the falsehoods in the statement strategically designed to harm Judge Ademiluyi. Judge Pearson testified that he never took issue with nor discussed with Investigative Counsel any personal text messages Judge Ademiluyi sent him that

one might perceive as salacious if the conversation is between male and female. Judge Ademiluyi was trying to line up allies to assist her because she was being retaliated against. Judge Pearson testified that the only reason Investigative Counsel had personal messages between Judge Ademiluyi and him was because Investigative Counsel asked for copies of all communications between him and Judge Ademiluyi.

107.    On February 26, 2024, Judge Ademiluyi deposed Judge Cotton, and that same day Planet Depos provided Judge Ademiluyi with a copy of the recording of the deposition.

108.    Planet Depos regularly provides a copy of the audio of depositions without the parties making the request when the depositions are recorded with digital reporter software.

**Fabrication of Evidence**

109.    On or about February 27, 2024, Judge Ademiluyi received the draft transcript of Judge Pearson's deposition testimony.

110.    The transcript of the deposition was fabricated and contained many material inaccuracies. The fabricated transcript created testimony that matches Investigative Counsel's summary of Judge Pearson's statement to her attached as Exhibit A to the Complaint. This was a false narrative to discredit Ademiluyi's rape experience, mischaracterize her as mentally unfit and cause job loss, severe emotional distress, and embarrassment.

111.    Reporter Andrews used the internet to transmit the fabricated transcript to Planet Depos and had many email communications with them thereafter misrepresenting the truthfulness of the transcript and the destruction of the recording.

112.    On or about March 4, 2024, Judge Ademiluyi requested a copy of the recording of the deposition from Planet Depos and Planet Depos informed Judge Ademiluyi that because the deposition was alleged to have taken with a stenographic machine, it is their policy to push the

custody of the recording onto the court reporter. Therefore, they did not have possession of the recording.

113.    On or about March 4, 2024, Planet Depos offered to contact Carla Andrews to request that she listen to the recording where the transcript is inaccurate. Judge Ademiluyi requested Andrews listen to the recording on a couple out of the several pages that Judge Ademiluyi knew was fabricated. Planet Depos conveyed that Andrews confirmed the accuracy of those pages.

114.    Plaintiff Ademiluyi knew Reporter Andrews was not being truthful and questioned her further through emailing and speaking to an Operations Specialist at Planet Depos.

115.    Prior to the start of the deposition, Judge Ademiluyi observed Reporter Andrew's recording setup and inquired from Andrews about how she could get a copy of the recording. Judge Ademiluyi and her counsel sat near Andrews and observed her record the deposition and simultaneously use a laptop throughout the proceedings.

116.    Reporter Andrews falsely stated in an affidavit attached to the transcript that the deposition was recorded contemporaneously with a stenographic machine.

117.    Plaintiff Ademiluyi brought to the attention of Planet Depos that there was no stenographic machine, and through Planet Depos, Reporter Andrews falsely replied that she used the stenographic machine in her lap. Reporter Andrews did not have any such stenographic machine in her lap or in the room. Andrews sat at the conference table with her laptop in front of her while she monitored the live feed of the recording from her laptop.

118.    Reporter Andrews created a stenographic file after the deposition to give to Planet Depos to create a false appearance that she used the machine at the deposition.

119.    Plaintiff Ademiluyi requested a copy of the recording from Reporter Andrews through Planet Depos, but Judge Pearson and Investigative Counsel immediately objected to Planet Depos releasing the recording.

**Motives For Evidence Tampering**

120.    Defendants Cotton and Adams' plan to use Pearson was extreme and outrageous, and built on all lies. From 2016 to 2020, among Prince George's County residents, Plaintiff Ademiluyi publicly spoke about her experience of being drugged and raped by lawyers in 2012. When she sought accountability, her efforts were stymied by public corruption. Judges Cotton and Adams sought to use Judge Pearson to discredit and torment Judge Ademiluyi about that experience in retaliation for the public corruption complaints she made against them. Exhibit A-B.

121.    Two of the few truthful substantive statements Judge Cotton made in her deposition testimony was: Judge Pearson did not want to take part in her malicious plot for revenge against Ademiluyi and she aggressively caused Investigative Counsel to open the CJD 2023-005 investigation on Judge Pearson's behalf without his knowledge.

122.    Defendants Cotton and Adams wielded major influence over Judge Pearson.

123.    Defendant Adams mentored and had administrative authority over Judge Pearson for 12 years. And most in the courthouse feared going against Judge Adams.

**The Romantic Affair between Pearson and Cotton influenced Pearson**

124.     Another problem for Defendant Pearson was that he and Judge Cotton were in a romantic relationship that they maintained in secrecy.  Judge Cotton is married to Joseph Cotton, an attorney, who is well known among the judges in the Prince George's County judiciary, including Judge Pearson.  The steamy affair between Judges Pearson and Cotton went on for years.

Phone records show that these two could not get enough of each other all day at work, after work, and all night.

125.    Their heavy, consistent cell communications ongoing for years that confirms their romantic affair, suddenly ceased a couple months after Judge Cotton caused the CJD 2023-005 investigation. Judge Pearson also has the same phone patterns with his assistant, Lesley Holmes, as he has with Judge Cotton and his cellular phone communications with them cease at the same time.    Judge Pearson and his assistant, Ms. Holmes, also deny the existence of a romantic relationship. The sudden lack of cellular communication for over one year suggests that Judge Pearson is avoiding a paper trail on his multiple inappropriate, romantic relationships in the workplace or disclosure of the content of their communications.

126.    Cotton and Adams initially succeeded in getting Judge Pearson to play the role to help them get revenge and causing the CJD2023-005 charges. Phone records confirm communications between Judge Pearson and Adams just before Judge Pearson and Cotton's first meeting with Investigative Counsel.

127.    Defendant Cotton told the Commission she wanted revenge for the complaints Ademiluyi filed, and she was relentless in her pursuit. Exhibit E.

128.    But Judge Pearson did not expect the CJD 2023-005 charges to occur. Judges Cotton and Adams' plot for revenge was spiraling and becoming a public spectacle. This caused Judge Pearson to again become very reluctant to participate.  Judge Cotton and others had to set Judge Pearson up with Reporter Andrews who would change his testimony, because they knew he was going to fail. And he did fail them.

129.    To bring Defendant Pearson's deposition testimony in line with Judges Cotton and Adams as well as all their statements given to Investigative Counsel, they had to fabricate the transcript.

130.    What started as a plot to retaliate for Judge Ademiluyi's public corruption complaints quickly turned into Judge Cotton fearing Judge Ademiluyi would interfere with her romantic affair with Pearson. Judge Cotton knew that Judge Pearson had a romantic interest in Judge Ademiluyi. Prior to Judge Cotton causing the opening of CJD2023-005 investigation, Judge Ademiluyi did not know, or suspect Judge Pearson had any sexual interest in Judge Cotton.

131.    Defendant Cotton's jealousy as Judge Pearson's romantic partner prevented Judge Pearson from communicating and working with Judge Ademiluyi. In February 2023, Judge Ademiluyi received notice that Investigation was investigating CJD2023-005. Judge Cotton made her sexual interest in Judge Pearson clear to Judge Ademiluyi and emphasized numerous times that Judge Pearson had not caused the opening of CJD 2023-005 investigation.

132.    In April 2023, Plaintiff Ademiluyi saw a flirtatious interaction between Judges Cotton and Pearson in front of Judge Lawrence Hill. In two meetings between February and May 2023, before and after seeing the flirtatious interaction between Judges Cotton and Pearson, Judge Ademiluyi told Judge Cotton she had no sexual interest in Judge Pearson and sought only an amicable professional relationship, but this was insufficient for Judge Cotton. Judge Cotton insisted that Plaintiff Ademiluyi and Defendant Pearson would never speak again and that they must communicate only in writing.

133.    On other subsequent interactions, Judge Defendant Cotton demonstrated jealousy over Ademiluyi's physical appearance, for e.g., commenting on her disgust at Plaintiff Ademiluyi's body being so physically fit. Ademiluyi is athletic, whereas Cotton is a much older plus-size woman. Defendant Cotton often made Judge Ademiluyi very feel uncomfortable with her jealous remarks about Plaintiff Ademiluyi's physical appearance. To alleviate her fears that Plaintiff Ademiluyi might diminish Defendant Pearson's sexual interest in her, Defendant Cotton demanded assurance that Judges Ademiluyi and Pearson would never see each other again.

134.    Defendant Cotton's deposition testimony revealed her sexual interest in Defendant Pearson. Judge Cotton demonstrated anger and jealousy over the text message invitation Judge Ademiluyi sent to Defendant Pearson inviting him to spend time with her so she can get his help with overcoming the retaliation.  For e.g., Plaintiff Ademiluyi's text to Defendant Pearson that they need to work out their tension; he can call her anytime; and she is always up late understandably upset his scorned lover, Defendant Cotton, because their phone records show voluminous communications between them all hours of the night.  But Judge Cotton, clearly being untruthful, denied having a romantic affair with Judge Pearson.

135.    Defendant Pearson, in his deposition, also being untruthful, denied having a romantic affair with Judge Cotton.

136.    Defendant Cotton is dangerously obsessed with keeping her clandestine romantic affair with Pearson and she thought Judge Ademiluyi would destroy that relationship.

137.    Joseph Cotton is telling members of the community that his wife, Judge Cotton, will "destroy" Ademiluyi. Exhibit A.

138.    Cotton conspired with Andrews to make false, material changes to Judge Pearson's deposition transcript to harm Judge Ademiluyi.

139.    Cotton is the only person who could have created some parts of the fabricated transcript. For e.g., the transcript details a conversation Plaintiff Ademiluyi had first with Pearson, on April 28, 2023, and a week later with Cotton about Pearson, without authority, presiding over Plaintiff Ademiluyi's violation of probation case.   Cotton and Pearson subsequently spoke to Investigative Counsel, on April 28, 2023, about the discussion between  Pearson and Plaintiff Ademiluyi. Plaintiff Ademiluyi did not tell Cotton the name of the case or give much detail about what happened.  Cotton drafted the transcript to say that Pearson was presiding over the case because: it was his assigned case that the courtroom clerk called him to take and Plaintiff

Ademiluyi had only presided over the case while she was training. This was also Investigative Counsel summary of Pearson's statement to her. But the violation of probation case was never assigned to Pearson nor was it assigned to Plaintiff Ademiluyi while training. In their discussion, Pearson apologized to Plaintiff Ademiluyi for taking her case. Pearson attempted to cover up his secret lover's mistake and change this testimony at the public hearing to avoid impeachment.

140. The relevant portion of Judge Pearson's statement to Investigative Counsel that he acknowledged when he publicly testified reads in pertinent part:

> .....On April 28, 2023, Judge Pearson advised that Judge Ademiluyi approached Judge Pearson at the judicial conference to ask why he took a case from her. Judge Pearson explained he received a call while he was in court asking him to take a VOP case that had his name on it, so he did. Judge Ademiluyi had handled the case during his training with Judge Pearson so they both had to sign the order. ...Judge Pearson thought the matter was closed following their discussion, but Judge Ademiluyi subsequently emailed him about it....

141. At the conclusion of Investigative Counsel's investigation, she produced a statement summary purportedly given by Pearson; however, the substance of the summarized statement was provided to Investigative Counsel by Cotton. Cotton was so obsessed with maintaining her romantic relationship with Pearson that she not only provided the substance of Pearson's "statement" to Investigative Counsel, but she also corruptly influenced the court reporter, whom Cotton had a relationship with, to change Pearson's deposition testimony to be consistent with Cotton's prior statement to Investigative Counsel. Albright prevented Plaintiff Ademiluyi from asking Pearson or any other witness questions about statements provided to Investigative Counsel both during depositions and at the public proceedings.

### Adams and Cotton's conspiracy with Rolle, Parks and Crump influenced Pearson

142. Adams was so obsessed with revenge that she too pressured Pearson to change his deposition testimony.

143. Parks, Crump, and Rolle were working with Adams, Cotton and Pearson to punish Ademiluyi for reporting and speaking out publicly about the drug rape and that Parks and Crump bribed former prosecutor Pamela Bondi to destroy the recorded confession of the drug rape.

144. On two occasions, after Ademiluyi sent Pearson the January 21, 2023 FBI email, at meetings, Pearson went out his way to embrace Rolle in front of Ademiluyi to demonstrate to Ademiluyi that he was working with the conspiracy to harm her.

145. Parks and Crump are involved in a pattern of tampering with recordings of testimony to harm Ademiluyi to cover up criminal activity and retaliate for reporting criminal activity.

146. Prior to Defendant Pearson's deposition, Reporter Andrews directly or indirectly had a relationship with Judges Adams and Cotton. Unbeknownst to Judge Ademiluyi and her counsel, either directly or indirectly Cotton selected Reporter Andrews to be the court reporter that Planet Depos used for Judge Pearson's deposition.

147. Defendant Cotton, as the Administrative Judge, can use her authority and return the corrupt favor Reporter Andrews gave her in this case by hiring Reporter Andrews at any time to perform work at the Circuit Court for Prince George's County and pay her a generous compensation. Reporter Andrews is currently seeking better job opportunities.

**Destruction of Evidence**

148. On or about March 5, 2024, Planet Depos immediately secured a copy of the audio recording from Reporter Andrews.

149. At this point, Planet Depos indicated they were a neutral party and would not release the audio without a court order or agreement from the parties.

150. Pearson and Investigative Counsel actively sought to block the release of the audio recording of the deposition.

151.    Planet Depos supports taking action that will ensure the integrity of the deposition process. All their depositions are recorded by audio or audio-video means to ensure the accuracy of a transcript. A stenographer must have the option to listen to a recording after the deposition to ensure the accuracy of the transcript. And the stenographer, under judiciary retention policies, must retain the recording.

152.    On or about March 13, 2024, with his secret lover, Judge Cotton, going to extraordinary lengths to undermine him, Judge Pearson caved to Judge Cotton's pressure. Judge Pearson had to appease the jealous rage of his scorned lover, Judge Cotton, who felt Judge Ademiluyi was threatening their relationship. Judge Pearson thus solidified his place in the criminal conspiracy to harm Judge Ademiluyi by signing an affidavit endorsing the transcript with no changes.

153.    The next day Albright blocked Judge Ademiluyi from listening to the recording.

154.    Planet Depos subsequently assisted Judge Ademiluyi in investigating the suspicious behavior of her adversaries and found that the recording Andrews provided them with was inaudible, and a transcript could not be prepared or verified from the recording.

155.    Andrews alleges she created two copies of the recording. But she further alleges that one copy was immediately erased, and the other is conveniently inaudible for 3 hours except for the one-minute portion Judge Ademiluyi asked her to verify. Judge Ademiluyi tested Reporter Andrews truthfulness on a couple out of the several pages that were fabricated. Any recording that happens to be partially audible or audible only on the couple pages of the deposition transcript that Ademiluyi asked Andrews to verify is fake.

**The Impact of Evidence Tampering**

156.    Judge Pearson, who initially was trying to get himself out of some of the lies orchestrated to harm Judge Ademiluyi changed his mind.  The fabricated transcript and his

testimony at the public hearing was the opposite of his deposition testimony. Pearson testified publicly that he filed a complaint against Plaintiff Ademiluyi because she was sending him salacious text messages and he wanted her to leave him alone. Pearson had to go to great lengths to cover up the jealousy of his scorned lover, also lying that he filed the complaint against Plaintiff Ademiluyi. This was consistent with the statement Pearson allegedly gave to Investigative Counsel and what Cotton wanted him to say.

157.    Investigative Counsel, despite their knowledge that Pearson's deposition transcript had been altered, called Judge Pearson to provide false testimony.

158.    Investigative Counsel and Albright enforced the judiciary's official policy and custom of retaliation. Investigative Counsel was retaliating against Judge Ademiluyi for her public corruption complaints and this federal lawsuit against her colleagues that pleads dishonesty of the Commission.  At Investigative Counsel's request, Albright, also retaliating, prohibited Judge Ademiluyi from putting on a case in CJD 2023-005 and impeaching Judge Pearson at the public hearing.

159.    Reporter Andrews, acting with malice, interfered with the contract between Plaintiff Ademiluyi and Planet Depos by assisting her coconspirators in producing a fabricated deposition transcript and destroying the audio recording of the deposition.

160.    Reporter Andrews, Judge Cotton and Judge Pearson caused Planet Depos to breach their contractual obligation to provide honest court reporting services at a deposition.

161.    Reporter Andrews, Judge Cotton and Judge Pearson violated numerous criminal statutes.

162.    Reporter Andrew's dishonest, corrupt court reporting services helped her coconspirators succeed in their plans to viciously attack Judge Ademiluyi. They revictimized her,

attempted to discredit her rape experience, asserted mental instability, and inflicted severe emotional distress.

163.    Reporter Andrews, Judges Cotton and Pearson's malicious interference with Judge Ademiluyi's contract with Planet Depos caused Judge Ademiluyi to experience reputational harm, anxiety, depression, emotional distress, attorney fees, and costs.

164.    Planet Depos charged Plaintiff Ademiluyi $826.05 for Pearson's deposition and a higher amount for Cotton's deposition, which Plaintiff Ademiluyi had no insurance to cover.

**Obstruction of Justice**

165.    Judges Cotton and Pearson have engaged in a pattern of abusing their authority to intimidate Plaintiff Ademiluyi and interfere with Plaintiff Ademiluyi's right to complain about their violations of federal law.

166.    Plaintiff Ademiluyi initially sued Reporter Andrews in Washington DC Superior Court on August 19, 2024. Plaintiff Ademiluyi dismissed it on October 10, 2024, to litigate the issues in this court. In that matter, Reporter Andrews refused to answer all discovery requests served on her.

167.    On August 26, 2024, Defendant Pearson and his secret lover who is also his assistant, Ms. Holmes, used Monet Hurley, Plaintiff Ademiluyi's former courtroom clerk to reach out to Plaintiff Ademiluyi to deceive her into providing information that Ms. Hurley can give to Ms. Holmes and Judge Pearson to harm Plaintiff Ademiluyi.  Ms. Holmes and Ms. Hurley have a friendship, they are hiding from Plaintiff Ademiluyi.  Plaintiff Ademiluyi did not communicate with Ms. Hurley. Judge Pearson knew of the lawsuit against Reporter Andrews that had neither his nor Judge Cotton's name on it before Plaintiff Ademiluyi gave Judges Cotton and Pearson  and anyone other than Reporter Andrews notice of the lawsuit.

168.    In early September 2024, Judge Cotton summoned Plaintiff Ademiluyi to report to jury duty in October 2024 to lure her to the courthouse, intimidate her, and prevent her from pursuing this case and complaining about the criminal conspiracy to harm her.

169.    Judges Cotton and Pearson used a similar intimidation tactic on Judge Ademiluyi in January 2024 after she was banned from the courthouse. Judge Cotton assigned Judge Pearson, the only case pending in the Circuit Court for Prince George's County where Judge Ademiluyi's counsel, Craig Brodsky Esq., was the lawyer on record. It was a personal injury case scheduled for a settlement conference, in which sitting Judges only preside over if there is no senior/retired judge available.

170.    Prior to the filing of this federal lawsuit, Defendants' Cotton and Pearson's criminal defense attorney, James Spiker, declined multiple requests from Judge Ademiluyi's counsel for a mediation or meeting to resolve the matter amicably with Judge Pearson because Judge Pearson's scorned lover, Judge Cotton, would not allow it.

171.    After the filing of this federal lawsuit, Judge Pearson, abusing his power as a judge, intimidated Judge Ademiluyi's lawyer to appease the rage of his scorned secret, lover Judge Cotton.

172.    Judge Pearson stood over Craig Brodsky, Esq. in a doorway and berated him about this federal lawsuit when Mr. Brodsky appeared before Judge Pearson on his personal injury case. Pearson admitted to this intimidation tactic in his testimony at the public hearing for CJD2023-005.

WHEREFORE, Plaintiff Ademiluyi prays this Court awards: a) Compensatory damages in excess of $75,000; (b) Punitive damages in an amount to be determined at trial; (c)Attorney fees; (d) Costs to include cost of the deposition; and (e) any such other and further relief as the Court deems just and proper.

## COUNT III INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

173.     Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

174.     Reporter Andrews, Judge Cotton, and Judge Pearson conspired to intentionally inflict severe emotional distress on Judge Ademiluyi through making, endorsing, or using the fabricated deposition transcript.

175.     The criminal conspiracy of Judge Cotton, Judge Pearson, Reporter Andrews, and others formed to cause Judge Ademiluyi severe emotional distress and job loss was extreme and outrageous.

176.     Reporter Andrews, a corrupt court reporter, who conspired with Judge Cotton, and others to alter Judge Pearson's testimony, then lied about it and destroyed the recording of the deposition engaged in extreme and outrageous conduct.

177.     Judge Ademiluyi had just completed treatment from a mental health provider for anxiety and stress caused by the retaliation.  The manipulation of Judge Pearson's deposition testimony worsened Judge Ademiluyi's condition causing her to suffer severe emotional distress. For months after Pearson testified at the public hearing, Ademiluyi experienced severe depression and anxiety such as crying spells, inability to sleep, eat, and engage in other normal daily activities.  To date, she still experiences relapses of these same symptoms that interfere with her ability to work.

WHEREFORE, Plaintiff Ademiluyi prays this Court awards: a) Compensatory damages in excess of $75,000; (b) Punitive damages ; (c)Attorney fees; (d) Costs including the cost of the deposition; and (e) any such other and further relief as the Court deems just and proper.

## PLAINTIFF DEMANDS TRIAL BY JURY

Plaintiff hereby demands a trial by jury on all issues triable by right of jury, including the issues punitive damages and other damages.


Respectfully submitted,

_____/s/_____
Ray Shepard, Esq.
Federal Bar No: 09473
The Shepard Law Firm, LLC
122 Rivera Drive
Pasadena, MD 21122
Office: 410 255-0700
Fax: 443-773-1922
Ray@shepard.law


__/s/ *Allen R. Dyer*__
Allen R. Dyer, Esq.
Federal Bar No: 19624
Law Office of Allen R. Dyer
13340 Hunt Ridge
Ellicott City, Maryland 21042
410-531-3965 / aldyer@lawlab.com

***Attorneys for April T. Ademiluyi***